1
2
3
4
5
6
7            UNITED STATES DISTRICT COURT
8            CENTRAL DISTRICT OF CALIFORNIA
9
10

| | |
|---|---|
| RICHARD SINOHUI, on behalf of himself and all others similarly situated<br><br>Plaintiff,<br><br>v.<br><br>CEC ENTERTAINMENT, INC., and Does 1 through 100, inclusive,<br><br>Defendants. | CASE NO. EDCV 14-2516-JLS (KKx)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR CLASS CERTIFICATION (Doc. 44)** |

1      Before the Court is Plaintiff Richard Sinohui's Motion for Class Certification.

2 (Mot., Doc. 44.)  Defendant CEC Entertainment, Inc. opposed, and Sinohui replied.  (Opp.,

3 Doc. 51; Reply, Doc. 52.)  Having reviewed the parties' briefs, held a hearing, and taken

4 the matter under submission, the Court GRANTS IN PART and DENIES IN PART

5 Plaintiff's Motion for Class Certification.

6

7  I.   **BACKGROUND**

8      The First Amended Complaint alleges the following facts:

9      Defendant CEC Entertainment, Inc. operates Chuck E. Cheese's restaurants

10 throughout the United States.  (FAC ¶ 21, Doc. 26.)  Plaintiff Richard Sinohui is a former

11 General Manager of a Chuck E. Cheese's restaurant in Murrieta, California.  (*See id*. ¶ 9.)

12 Sinohui alleges that because the responsibilities of a General Manager are "virtually

13 identical" to those of an hourly-paid employee, CEC uniformly misclassifies General

14 Managers as exempt employees.  (*Id*. ¶¶ 10, 12.)  Sinohui also alleges that General

15 Managers have been required to pay for necessary business expenses, such as the costs of

16 mileage and owning or leasing a cell phone, in violation of California law.  (*Id*. ¶¶ 101-04.)

17      On behalf of himself and those similarly situated, Sinohui filed the instant class

18 action in state court on October 10, 2014.  (Compl., Doc. 1-2.)  On December 5, 2014,

19 CEC removed the case to this Court.  (Notice of Removal, Doc. 1.)  Based on the principle

20 allegation that CEC misclassified General Managers as exempt employees, the FAC

21 asserts the following claims: (1) unpaid overtime wages, Cal. Lab. Code § 510(a);

22 (2) failure to provide meal periods, Cal. Lab. Code §§ 226.7(a), 512; (3) failure to provide

23 rest periods, Cal. Lab. Code § 516; (4) failure to provide accurate itemized wage

24 statements, Cal. Lab. Code § 226(a); and (5) failure to pay timely wages upon separation

25 from employment, Cal. Lab. Code § 203.  (FAC ¶¶ 44-99, 107-114.)  The FAC also

26 alleges the following claims: (6) failure to compensate business expenses, Cal. Lab. Code

27 § 2802; (7) civil penalties under the Private Attorneys General Act, Cal. Lab. Code § 2698,

28

*et seq.*, and (8) unfair business practices, Cal. Bus. & Prof. Code § 17200, *et seq.* (FAC ¶¶ 100-106, 115-156.)

Sinohui now moves to certify the following four classes pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3):

1. A Misclassification Class defined as: all persons employed by CEC in California as an exempt General Manager from October 10, 2010 through the date of Judgment;

2. A Wage Statement Class defined as: all persons employed by CEC in California as an exempt General Manager from October 10, 2010 through the date of Judgment, whose wage statements list bonus compensation and reflect 80 hours for a two week pay period;

3. An Expense Reimbursement Class defined as: all persons employed by CEC in California as an exempt General Manager from October 10, 2010 through the date of Judgment, who were not reimbursed for cell phone expenses and/or mileage;

4. An Unfair Business Practices Class defined as: all persons employed by CEC in California as an exempt General Manager from October 10, 2010 through the date of Judgment, and who are members of either the Wage Statement Class or the Expense Reimbursement Class.

(Mem. at 3, Doc. 35.)

## II.   **LEGAL STANDARD**

As the Supreme Court recently reaffirmed, "[t]he class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550 (2011). "To obtain class

certification, a class plaintiff has the burden[1] of showing that the requirements of Rule

23(a) are met and that the class is maintainable pursuant to Rule 23(b)." *Narouz v. Charter*

*Commc'ns, LLC*, 591 F.3d 1261, 1266 (9th Cir. 2010).  "Rule 23(a) ensures that the named

plaintiffs are appropriate representatives of the class whose claims they wish to litigate."

*Dukes*, 131 S. Ct. at 2550.  Under Rule 23(a), the party seeking certification must

demonstrate:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  "Second, the proposed class must satisfy at least one of the three

requirements listed in Rule 23(b)." *Dukes*, 131 S. Ct. at 2548.  Here, Plaintiffs seek

certification of the class under Rule 23(b)(3), which permits maintenance of a class action

if:

> the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

Fed. R. Civ. P. 23(b)(3).  When examining a class that seeks to be certified under Rule

23(b)(3), the Court may consider:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action.

---

[1] The plaintiff bears the burden of proof in a motion for class certification, "even if the plaintiffs' 'underlying claim arises under California law and the employer bears the burden of proving on [the] merits that the plaintiffs were not misclassified as exempt under state law.'" *See Pedroza v. PetSmart, Inc*., No. EDCV 11-298-GHK, 2013 WL 1490667, at *4 n.5 (C.D. Cal. Jan. 28, 2013) (quoting *Marlo v. UPS*, 639 F.3d 942, 946 (9th Cir. 2011)).

Fed. R. Civ. R. 23(b)(3).  "Rule 23 does not set forth a mere pleading standard.  A party seeking class certification must affirmatively demonstrate his compliance with the Rule— that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc."  *Dukes*, 131 S. Ct. at 2551.  This requires a district court to conduct a "rigorous analysis" that frequently "will entail some overlap with the merits of the plaintiff's underlying claim."  *Id.*

## III.   DISCUSSION

### A.   The Misclassification Class

Sinohui is unable to meet the predominance requirement of Rule 23(b)(3) for the Misclassification Class.  As a result, the Court need not address the other requirements of Rules 23(a) and 23(b)(3).

#### 1.   Predominance

The Supreme Court has explained that the predominance requirement under Rule 23(b)(3) "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 594 (1997).  "Implicit in the satisfaction of the predominance test is the notion that the adjudication of common issues will help achieve judicial economy."  *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996).  "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998) (quoting 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 1778 (2d ed.1986)).

The crux of this putative class and all its underlying claims is whether General Managers are misclassified as exempt.  (*See* Mem. at 15-16.)  There is no dispute that California wage and hour laws do "not apply to persons employed in administrative, executive, or professional capacities." Cal. Code Regs. tit. 8, § 11040(1)(A).  Under California law, the executive exemption applies to any employee: (a) whose duties and responsibilities involve the management of the enterprise in which he/she is employed, (b) who customarily and regularly directs the work of two or more other employees, (c) who has the authority to hire or fire other employees, (d) who customarily and regularly exercises discretion and independent judgment, (e) who is primarily engaged in duties which meet the test of the exemption, and (f) who earns a monthly salary equivalent to no less than two times the state minimum wage for full-time employment. *See id.* § 11040(1)(A)(1)(a)-(f).  Here, the only criterion at issue is whether General Managers are "primarily engaged in duties which meet the test of exemption."  (*See* Mem. at 18.)  Under the "primarily engaged" requirement of executive exemption, courts must determine whether the employee spends "more than one-half [of his or her] work time" on exempt duties.  Cal. Code Regs. tit. 8, § 11040(2)(N).  "The work actually performed by the employee during the course of the workweek must, first and foremost, be examined and the amount of time the employee spends on such work, together with the employer's realistic expectations and the realistic requirements of the job, shall be considered in determining whether the employee satisfies this requirement." *Id.* § 11040(1)(A)(1)(e).

"When the claim is that an employer's policy and practices violated labor law, the key question for class certification is whether there is a consistent employer practice that could be the basis for consistent liability." *Kamar v. Radio Shack Corp.*, 254 F.R.D. 387, 399 (C.D. Cal. 2008).  "In undertaking . . . predominance inquiries in misclassification cases, the court considers a rough hierarchy of certain types of evidence." *Zackaria v. Wal-Mart Stores, Inc.*, No. EDCV 12-1520 FMO, 2015 WL 2412103, at *9 (C.D. Cal. May 18, 2015).  "At the bottom are company policies declaring that a certain job title is

uniformly exempt or non-exempt." *Id.* (citing *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 957 (9th Cir. 2009)).  Courts may not rely on blanket exemption policies to certify a class "to the [] exclusion of other factors [more] relevant to the predominance inquiry," such as how "the individual employees actually spent their time" and "comprehensive uniform policies detailing the job duties and responsibilities of employees." *See In re Wells Fargo*, 571 F.3d at 958-59.  To support his contention that common questions predominate over individual inquiries, Sinohui primarily relies on (1) CEC's use of a "Sales Per Man Hour" Target and other considerations allegedly resulting in routine understaffing, (2) the standardized staffing, systems, policies, and procedures at CEC restaurants, (3) the uniform training of General Managers, (4) the uniform policies and supervision imposed on General Managers, (5) CEC's identification of a General Manager's exempt and nonexempt tasks, (6) CEC's expectations of a General Manager's duties, and (7) the declarations of fifty-four[2] General Managers.  (*See* Mem. at 4-12, 21-23; Reply at 12, 13 n.1.)  In considering the record before us, we find that individual issues predominate and counsel against class certification.

The Court first addresses the "Sales Per Man Hour" Target and other understaffing assertions.  As background, both parties assert that CEC's Daily Labor Guide once recommended that all California CEC restaurants use 28 labor hours for the first $100 in sales and one additional hour of labor for every additional $100 in sales.  (*See* Mem. at 9-10; Opp. at 12-13; Brown Tr. 227:7-228:12, 230:17-24, McLaughlin Decl. Ex. A, Doc. 51-3).  Although CEC eliminated this Guide in 2012, CEC continues to use a version of this formula as a labor guide for its restaurants.  (*See* Brown Tr. 238:6-25, Doc. 45-3.)  CEC

---

[2] In his Reply, Sinohui asserts that he has provided fifty-five declarations from putative class members in support of class certification.  (Reply at 12, 13 n.1.)  However, Trush's Reply Declaration indicates that Sinohui has provided a total of fifty-three declarations.  (Trush Reply Decl. ¶ 7, Doc. 52-1.)  Including all the declarations provided by Plaintiff, including his own declaration, we find that he has provided fifty-four declarations from putative class members.  (*See* Trush Decl. Exs. 31-78, 80; Trush Reply Decl. Exs. 90-94.)

calculates its current SPMH targets by dividing last year's sales by last year's labor hours. (*Id.*)  Sinohui asserts that General Managers routinely receive emails from supervisors that emphasize cutting hourly-paid labor to meet SPMH targets.  (Mem. at 11.)  Thus, to comply with these guidelines in light of decreased sales, General Managers send hourly-paid employees home before the end of their shifts to maintain profitability.  (*Id.*; Brown Tr. 75:11-15, 77:24-78:4, Trush Decl. Ex. 22, Doc. 45-3; Charlebois Tr. 37:3-17, Trush Decl. Ex. 27, Doc. 45-5.)  If business then picks up, General Managers may be required to perform the non-exempt duties of the employee they sent home.  (Mem. at 11.)  Sinohui also asserts that General Managers are expected to perform nonexempt tasks when hourly-paid employees take their meal or rest breaks, or when these employees quit and further contribute to understaffing.  (Mem. at 11-12.)  Sinohui argues that these policies create an expectation and requirement that General Managers spend a majority of their time on nonexempt tasks.

Although these policies may support an expectation that General Managers perform *some* nonexempt duties, it is unclear how they uniformly require General Managers to "primarily engage" in non-exempt tasks.  In fact, the evidence before the Court demonstrates that resolving this question depends on the individual circumstances of each General Manager.  The SPMH targets vary based on the sales volume and staff sizes at each restaurant.  General Managers have discretion to deviate from SPMH targets when needed, (*see* Brown Tr. 311:19-25, McLaughlin Decl. Ex. A, Doc. 51-3; Khan Tr. 222:11-226:25, McLaughlin Decl. Ex. F, Doc. 51-8; Chatwani Decl. ¶ 27, Doc. 51-23; Chavez Tr. 95:19-98:16, McLaughlin Decl. Ex. D, Doc. 51-6), and the record demonstrates a lack of uniformity even when General Managers sought to comply with SPMH targets.  Some, like Sinohui, send employees home "every day," (Sinohui Tr. 102:6-10, McLaughlin Decl. Ex. I, Doc. 51-11), some rarely send employees home early, (Edwards Decl. ¶ 22, Doc. 51-27; Martinez Decl. ¶ 14, Doc. 51-30), some only send employees home when their role has become completely unnecessary, (Amaro Decl. ¶ 25, Doc. 51-22; Porter Decl. ¶ 8, Doc.

51-33; N. Martinez Decl. ¶ 21, Doc. 51-31), some send employees home when others are available to provide coverage, (Zmily Decl. ¶ 6, Doc. 51-36), and others send less experienced employees home early, so more experienced employees can provide coverage, (*id*). Whether General Managers then engage in hourly tasks may also vary depending on whether and to what extent business "picks up" after they send hourly employees home.

Individual inquiries would similarly predominate when addressing CEC's coverage policy. Sinohui's own evidence indicates that when hourly-paid employees take meal or rest breaks, any employee must cover them—not strictly General Managers. (*See* Brown Tr. 102:6-105:9, McLaughlin Decl. Ex. A, Doc. 51-3.) As reflected in the record, whether General Managers must then cover for hourly-paid employees and engage in nonexempt tasks depends on a variety of individualized factors, such as the sales volume of each restaurant and whether General Managers planned their employees' schedules such that other employees could provide coverage. (*See* Light Decl. ¶¶ 3, 11, Doc. 51-29; Zmily ¶ 4, 28; Murrieta Decl. ¶¶ 4-5, Doc. 51-32; Amaro Decl. ¶ 16; Coronado Decl. ¶ 9, Doc. 51-24; Chatwani Decl. ¶ 15; Escobar Tr. 32:10-19, 34:10-14, McLaughlin Decl. Ex. E, Doc. 51-7.) The identified policies regarding SPMH targets and coverage do not require that General Managers spend a majority of their time performing non-exempt work, and whether any given restaurant was so understaffed that General Managers "primarily engaged" in hourly tasks remains an individualized inquiry.

Moreover, the evidence in this case demonstrates that the types of duties and the time allocated to them may vary greatly between General Managers. For example, some General Managers spend only a few hours per week on administrative work, (Cardenas Tr. 55:20-57:17, McLaughlin Decl. Ex. B, Doc. 51-4), whereas others spend up to 9 or 10 hours per week, (Aguilar Decl. ¶ 4, Doc. 51-21; N. Martinez Decl. ¶¶ 5-8; Smith-Watson Decl. ¶ 10, Doc. 51-35). Some General Managers prepare the weekly schedules for their restaurants, (Edwards Decl. ¶ 13, Doc. 51-27; Murrieta Decl. ¶ 17; Troy Tr. 71:8-72:17, McLaughlin Decl. Ex. J, Doc. 51-12), whereas others delegate scheduling to their

assistants, (Martinez Decl. ¶ 13; Zapata Tr. 130:5-14, McLaughlin Decl. Ex. K, Doc. 51-13).  General Managers who do prepare schedules spend varying amounts of time per week on this task, depending on restaurant size and labor volume.  (*See* Edwards Decl. ¶ 13; Troy Tr. 73:16-21, McLaughlin Decl. Ex. J, Doc. 51-12; Murrieta Decl. ¶¶ 13, 17; Cardenas Tr. 43:12-14, McLaughlin Decl. Ex. B, Doc. 51-4.)  Staff size and employee turnover vary among restaurants, resulting in some General Managers spending significantly more time on interviewing, hiring, and training others.  (*Compare* Amaro Decl. ¶¶ 3, 9 (high turnover, "constantly" hiring); Zmily Decl. ¶ 23 (3 hours each week on hiring); Rojas Decl. ¶¶ 13, 16, Doc. 51-34 (120 hours in last six months on orientation and first week's training); *with* Chavez Tr. 67:4-68:14, McLaughlin Decl. Ex. D, Doc. 51-6 (only 1 hour 40 minutes on interviewing during the last year); Sinohui Tr. 327:15-328:14, McLaughlin Decl. Ex. I, doc. 51-11 (10 minutes on training new hires)).  The evidence demonstrates that similar variances exist as to ongoing training, evaluating employees, fundraisers and business development, restaurant walkthroughs, and responding to questions, as well as nonexempt duties such as cashiering and working in the kitchen.  (*See* Opp. at 9-12.)  The sixteen declarations provided by CEC provide examples of General Managers who spend the majority of their time on exempt duties.  (*See* Appendix of Putative Class Member Declarations Exs. 1-16, Docs. 51-21 to 51-36.)

The cases cited by Sinohui acknowledge that circumstances "in which liability itself is predicated on factual questions specific to individual claimants pose[] a much greater challenge to manageability [of a class action] . . . . Only in an extraordinary situation would a class action be justified where, subsequent to the class judgment, the members would be required to individually prove not only damages but also liability."  *Martinez v. Joe's Crab Shack Holdings*, 231 Cal. App. 4th 362, 378 (2014) (emphasis omitted) (quoting *Duran v. U.S. Bank Nat'l Ass'n*, 59 Cal. 4th 1, 30 (2014)).  In light of the variety of tasks and the time allocated to them present in the record before us, Sinohui fails to demonstrate that General Managers' experiences are uniform such that common questions

would predominate.  Courts faced with similarly varying tasks have declined to certify the putative class based on predominance concerns.  *See Zackaria*, 2015 WL 2412103, at *15 ("[T]he salient question of whether a[] [General Manager] is primarily engaged in tasks meeting the test for the exemptions will likely require resolving individual questions of fact."); *Friend v. Hertz Corp*., No. C-07-5222 MMC, 2011 WL 750741, at *5 (N.D. Cal. Feb. 24, 2011) ("[P]laintiffs have failed to show the duties performed by Location Managers are of a similar character and/or performed for a similar duration, such that issues common to the class would predominate over individual issues."); *Accord Vinole v. Countrywide Home Loans, Inc*., 571 F.3d 935, 947 (9th Cir. 2009) (absent evidence of "company-wide policies governing how employees spend their time" or "uniformity in work duties and experiences that diminish the need for individualized inquiry," common issues of law and fact are unlikely to predominate).

The other alleged forms of "common proof" identified by Sinohui do not alter the Court's conclusion.  Sinohui asserts that Chuck E. Cheese restaurants have the same employment structures, use the same "Aloha" cash register system to track hours, and use uniform "Get Ready Checklists," hours of operations, Operation Management Handbook, and video surveillance systems.  (Mem. at 4-6.)  Sinohui also asserts that General Managers undergo uniform training, share the same formal job description, and are subject to the same policies, procedures, and performance review processes.  (*Id*. at 6-8.)  However, Sinohui does not assert how these allegedly uniform policies "actually impact the potential class—*i.e*., whether proposed class members in fact engage primarily in nonexempt activities."  *See Dailey v. Sears, Roebuck & Co*., 214 Cal. App. 4th 974, 989 (2013) (citing *Walsh v. IKON Office Sols., Inc*., 148 Cal. App. 4th 1440, 1461 (2007)).  Records that track employee hours "reveal only the length of time worked by [General Managers], not the tasks they performed during those periods."  *See Pedroza v. Petsmart, Inc.*, No. EDCV 11-298-GHK, 2013 WL 1490667, at *8 (C.D. Cal. Jan. 28, 2013).  Uniformity of training has "limited value in establishing a common practice" because,

1   without more, "it does not tell us how [General Managers] allocated their time between

2   exempt and nonexempt time as a class." *Id*. at *9 (citing *Cruz v. Dollar Tree Stores, Inc*.,

3   No. 07-2050 SC, 2011 WL 2682967, at *8 (N.D. Cal. July 8, 2011); *Weigele v. FedEx*

4   *Ground Package Sys., Inc*., 267 F.R.D. 614, 622 (S.D. Cal. 2010)).  The General

5   Manager's job description, which identifies only exempt duties and responsibilities,

6   supports a realistic expectation that General Managers primarily engage in exempt rather

7   than non-exempt duties.  (*See* GM Job Description, Trush Decl. Ex. 8, Doc. 45-1.)  Sinohui

8   correctly observes that this description requires fifty to sixty hours per week, which

9   provides class-wide proof that General Managers were realistically expected to work hours

10  that would entitle them to overtime compensation if they were in fact non-exempt

11  employees.  (Reply at 9.)  But that begs the question: entitlement to overtime

12  compensation derives from an employee's non-exempt status, and Sinohui fails to explain

13  what common proof as to the misclassification issue underlies this proposed class.  Sinohui

14  also argues that CEC does not instruct General Managers to spend the majority of their

15  time on exempt duties, and that CEC does not explain to General Managers why they are

16  exempt rather than non-exempt employees.  (Mem at 8-9; Reply at 4-5.)  However, such

17  "practices" fail to generate common proof sufficient to predominate over the individual

18  inquiries identified above.

19       The Court then turns to whether Sinohui's proffered declarations provide common

20  proof capable of class-wide resolution.  When considering a motion for class certification,

21  district courts cannot "weigh the evidence or otherwise evaluate the merits of a plaintiff's

22  class claim," but they may evaluate the plaintiff's evidence to determine whether it

23  "support[s] a class-wide finding regarding [Rule 23] certification."  *See Marlo v. United*

24  *Parcel Serv., Inc*., 639 F.3d 942, 949 (9th Cir. 2011) (internal quotation marks omitted)

25  (affirming the district court's determination that the plaintiff's declarations and deposition

26  testimony "did not support a class-wide determination.").  Here, fifty-four of the 126

27  putative class members provided declarations about their experiences at fifty-three of the

28

eighty-one restaurants in California.  (*See* Mem. at 12; Trush Decl. Exs. 31-78, 80, Docs. 45-5, 45-6, 45-7, 45-8, 45-9, 45-10; Trush Reply Decl. ¶ 7, Exs. 90-94, Doc. 52-1.) "[U]nder *Dukes*, for anecdotal evidence to give rise to an inference of a common practice, the evidence should be representative in number and in geography."  *Pedroza*, 2013 WL 1490667, at *8 (citing *Dukes*, 131 S. Ct. at 2556).  The *Dukes* court found that 120 affidavits were "too weak to raise any inference" of a discriminatory practice where they represented only 1/12,500 of the putative class and related to only 235 of Wal-Mart's 3,400 stores.  *Dukes*, 131 S. Ct. at 2556.  The declarations offered in this case are significantly more representative in number and geography.  However, even if the Court accepts that the declarations are sufficiently representative, concerns remain as to the declarations' content.  The declarations uniformly state that each General Manager spent 80-90% or 70-80% of their time on identical nonexempt duties.  Although the declarations conclude that General Managers primarily engage in non-exempt duties as a result of SPMH targets and other understaffing concerns, they do not provide any indication of "how the managers calculated the percentages of their time spent on [their tasks]."  *See Akaosugi v. Benihana Nat'l Corp.*, 282 F.R.D. 241, 252 (N.D. Cal. 2012).  Notably, the declarants that CEC deposed were unable to explain *how* they estimated or calculated the time spent on exempt duties.  (*See* Rivas Tr. 111:15-113:16, 168:20-169:4, McLaughlin Decl. Ex. H, Doc. 51-10; Chavez Tr. 138:19-140:6, McLaughlin Decl. Ex. D, Doc. 51-6; Cardenas Tr. 55:24-57:14, 63:22-64:6, McLaughlin Decl. Ex. B, Doc. 51-4; Troy Tr. 62:14-17, 75:23-76:18, McLaughlin Decl. Ex. J, Doc. 51-12; Escobar Tr. 66:17-21, 90:6-91:21, 161:4-164:22, McLaughlin Decl. Ex. E, Doc. 51-7; Zapata Tr. 111:4-12, McLaughlin Decl. Ex. K, Doc. 51-13; Sinohui Tr. 150:11-152:20, McLaughlin Decl. Ex. I, Doc. 151-11.)  Even if these fifty-four putative class members primarily engaged in nonexempt tasks, Sinohui has "failed to show that the question of how managers spend their works days will be capable of a *common method of proof* at trial."  *Akaosugi*, 282 F.R.D. at 253.  The declarations provide bare assertions that do not sufficiently counter the

1  Court's concern that "[t]he misclassification claim[s] would require an individualized

2  analysis of how each manager spent his or her time and what percentage of that time was

3  spent on exempt tasks."[3]  *Id.*

4  The Court notes that "individual issues will not *necessarily* overwhelm common

5  issues when a case involves exemptions premised on how employees spend the workday."

6  *Duran v. U.S. Bank Nat'l Ass'n*, 59 Cal. 4th 1, 31 (2014) (emphasis in original).  It is true

7  that when analyzing whether employees are primarily engaged in exempt or non-exempt

8  duties, courts must engage in fact-specific inquiries as to the work "actually performed by

9  the employee during the course of workweek."  *See* Cal. Code Regs. tit. 8,

10  § 11040(1)(A)(1)(e).  However, "[w]here standardized job duties or other policies result in

11  employees uniformly spending most of their time on nonexempt work, class treatment may

12  be appropriate even if the case involves an exemption that typically entails fact-specific

13  individual inquiries."  *Duran*, 59 Cal. 4th at 31.  Here, predominance concerns are not

14  implicated solely because the misclassification issue requires an analysis of what

15  employees actually do.  Rather, it is the lack of common proof, *i.e.*, uniform policies or

16  practices that would generate common answers as to liability, that proves fatal to class

17  certification.  At the hearing and in his papers, Sinohui insists that class certification is

18  proper because his "*theory* focuses on whether CEC's expectations for the GM position are

19  realistic, not just the 'time spent performing exempt duties.'"  (*See* Reply at 15 (emphasis

20  added).)  Theories, however, are insufficient to support class certification without an

21  adequate degree of *common proof*.  As the Court concludes above, the "policies" and

---

[3] Sinohui argues in his Reply that CEC fails to offer video surveillance footage or cash register reports, which he claims constitute "the best evidence available to [CEC]" as to the misclassification claims.  (Reply at 14.)  However, Sinohui fails to acknowledge that such evidence would require examination into the individual experiences of each General Manager at each Chuck E. Cheese's restaurant, which would undoubtedly raise individual inquiries that predominate common proof.

1  "uniform practices" identified by Sinohui fail to generate common proof such that

2  common questions predominate over individual inquiries in this action.

3        At the hearing and in his papers, Sinohui also argues that the facts of this case are

4  sufficiently similar to those underlying certain California state court decisions such that the

5  Court should grant class certification.  (*See* Reply at 2-4, citing *Sav-On Drug Stores v.*

6  *Superior Court*, 34 Cal. 4th 319 (2004); *Duran v. U.S. Bank Nat'l Ass'n*, 59 Cal. 4th 1

7  (2014) (Liu, J., concurring); and *Martinez v. Joe's Crab Shack Holdings*, 231 Cal. App.

8  4th 362 (2014)).  As explained below, these decisions are distinguishable and do not

9  support certification of the Misclassification Class in this case.

10        In *Sav-On Drug Stores v. Superior Court*, the California Supreme Court found that

11  the trial court had not abused its discretion in finding that common issues predominated

12  over individual inquiries in a wage and hour class action.  *Sav-On Drug Stores*, 34 Cal. 4th

13  at 327.  There, the predominating common issues were whether there had been an

14  improper blanket misclassification and whether the "reasonably definite and finite list" of

15  tasks performed by operating managers and assistant managers were properly classified as

16  "managerial" or "non-managerial."  *Id*. at 331.  This second consideration favored

17  certification because "the only difference between Defendant's declarations and Plaintiff's

18  evidence [wa]s that the parties disagree[d] on whether certain identical work tasks [we]re

19  'managerial' or 'non-managerial,'" which was "an issue that c[ould] easily be resolved on

20  a class-wide basis by assigning each task to one side of the 'ledger.'"  *Id*.  Although

21  Sinohui argues that this second consideration is present here, the record before the Court

22  does not support his assertion.  Rather, as acknowledged by Sinohui in his Reply, the

23  parties dispute the *amount of time* that each General Manager spends on managerial or

24  non-managerial duties.  (*See* Reply at 1.)  Where "the predominating issue . . . is the actual

25  mix of duties worked[,] which entails a need to conduct an individual inquiry for each

26  class member," courts have generally distinguished *Sav-On* and denied class certification.

27  *See Jimenez v. Domino's Pizza, Inc.*, 238 F.R.D. 241, 252 (C.D. Cal. 2006); *see also*

28

*Pedroza*, 2013 WL 1490667, at *10; *O'Hearn v. Les Schwab Warehouse Ctr., Inc*., No. C13-2005 TSZ, 2014 WL 6654207, at *9 (W.D. Wash. Nov. 24, 2014).

Sinohui also cites Justice Liu's concurrence in *Duran v. U.S. Bank National Association*, 59 Cal. 4th 1 (2014), to argue that the Court should grant class certification based solely on CEC's realistic expectations and the actual requirements of the job. (Reply at 3-4.)  At issue in *Duran* was the outside salesperson exemption, which applies to any salesperson "who customarily and regularly works more than half the working time away from the employer's place of business[.]"  *Duran*, 59 Cal. 4th at 26.  In his concurring opinion, Justice Liu "offer[s] a few comments to further elucidate the proper inquiry at the class certification stage of an employee misclassification case[.]"  *Id*. at 51. Justice Liu observes that courts are often uncertain whether California's quantitative approach to employee classification is resolved by (a) "the number of hours that the employer, according to its job description or estimate, claims the employee *should* be working," or (b) the "actual average hours the employee spent."  *Id*. at 52 (emphasis in original).  Justice Liu states that neither inquiry is "wholly satisfactory"—rather, trial courts should "inquir[e] into the *realistic* requirements of the job."  *Id*. (emphasis in original).

> In so doing, the Court should consider, first and foremost, how the employee actually spends his or her time.  But the trial court should also consider whether the employee's practice diverges from the employer's realistic expectations, whether there was any concrete expression of employer displeasure over an employee's substandard performance, and whether these expressions were themselves realistic given the actual overall requirements of the job.

*Id*. (quoting *Ramirez v. Yosemite Water Co*., 20 Cal. 4th 785, 802 (1999)).  Contrary to Sinohui's assertions, Justice Liu's concurrence does not stand for the proposition that the Court should forego an analysis of the actual work performed.  Rather, it acknowledges

1   that "variation in how employees spend their time does not, *by itself*, preclude a finding

2   that an employer's realistic expectations are susceptible to common proof." *Id*. at 54

3   (emphasis added).  Although Sinohui asserts that CEC's realistic expectations and the

4   realistic requirements of the job require General Managers to "primarily engage" in non-

5   exempt tasks, he fails to demonstrate that these considerations are susceptible to common

6   proof.  As explained above, resolving this issue would require inquiries into the

7   circumstances of each General Manager such that individual questions would overwhelm

8   the common questions in this action.  Accordingly, *Duran* does not alter the Court's

9   conclusion.

10          Nor does Sinohui's reliance on *Martinez v. Joe's Crab Shack Holdings* change our

11   analysis.  In *Martinez*, 182 general managers and assistant managers at Joe's Crab Shack

12   restaurants sought class treatment in an overtime case based on misclassification.  231 Cal.

13   App. 4th at 368-69, 369 n.4.  According to the *Martinez* plaintiffs, "[w]hat was common to

14   plaintiffs, in addition to the standard policies implemented by [the defendant] at each of

15   [its] restaurants, was their assertions their tasks *did not change once they became*

16   *managers*; they performed a utility function and routinely filled in for hourly workers in

17   performing nonexempt tasks; and they worked far in excess of 40 hours per week without

18   being paid overtime wages." *Id*. at 376 (emphasis added).  Notably, *Martinez* did not view

19   the plaintiffs equally.  The record demonstrated that many of the tasks performed by

20   assistant managers "[were] identical to those performed by nonexempt employees,"

21   whereas general managers performed higher rung duties and "overwhelmingly opposed the

22   litigation." *Id*.  The appellate court in *Martinez* remanded for reconsideration of

23   certification, but it acknowledged that the district court could "exercise its discretion to

24   create a general managers subclass or [] exclude general managers entirely from the class

25   definition." *Id*.  Thus, in *Martinez*, the "crux of the matter . . . lies in whether a typically

26   nonexempt task becomes exempt when performed by a managerial employee charged with

27   supervision of other employees." *Id*. at 381.  This inquiry is not before the Court in this

28

1    case.  Here, Sinohui acknowledges that General Managers are given managerial duties that

2    no other hourly employee is allowed to perform, including assistant managers.  (Mem. at

3    7.)  "[T]he key question in this case" is not "'whether a typically nonexempt task becomes

4    exempt' when performed by a [General Manager]," as it was in *Martinez*, "but whether

5    individual [General Managers] engage[] in management more than half of their time."  *See*

6    *Mies v. Sephora USA, Inc*., 234 Cal. App. 4th 967, 986 n.18 (2015).  As a result, *Martinez*

7    is distinguishable and does not change the Court's conclusion as to the lack of

8    predominance in this case.  *See id*.

9            "[T]he touchstone of an exemption analysis is the reality of the workplace[.]"

10   *Zackaria*, 2015 WL 2412103, at *16.  Here, as in *Zackaria*, "the record before the court

11   suggests that determining whether a [General Manager] is primarily engaged in activities

12   meeting the tests for an exemption is an individual question, not one that can be easily

13   resolved through common proof."  *Id*.  Because individual inquiries would overwhelm

14   common questions of law and fact, Sinohui fails to demonstrate predominance under Rule

15   23(b)(3).

16

17           **2.       Conclusion as to the Misclassification Class**

18           Because Sinohui fails to satisfy the predominance requirement of Rule 23(b)(3), the

19   proposed Misclassification Class is not suitable for class treatment.  Accordingly, the

20   motion to certify this putative class is DENIED.[4]

21   _____

22           [4] Although Sinohui does not address statistical sampling in his Motion or Reply, he does attach
     a report by Richard Drogin, Ph.D, who opines that random sampling could be used to establish

23   both liability and damages in this case.  (Drogin Report ¶ 5, Trush Decl. Ex. 79, Doc. 45-10.)  As
     to liability, Dr. Drogin asserts that "random sampling would be an appropriate statistical technique

24   for obtaining representative evidence from a subset of class members in this case about the nature
     of the job, tasks performed, time spent on various tasks, the expectations of the defendant for work

25   performed by class members, and the realistic requirements of the job."  (*Id*.)  Although courts
     have generally accepted the use of statistical sampling to determine damages on a class-wide

26   basis, *see Sav-On*, 34 Cal. 4th at 333, "[e]mploying random sampling to prove liability is more

27

28

1

2      **B.      Wage Statement Class**

3           The Court also declines to certify the Wage Statement Class based on the papers

4      and record currently before the Court.  California Labor Code § 226(a) requires wage

5      statements to show the total hours worked by any employee, except for those employees

6      whose compensation is solely based on a salary and who are exempt from payment of

7      overtime under § 515(a) or an applicable order of the Industrial Welfare Commission.  *See*

8      Cal. Lab. Code § 226(a).  Sinohui's current theory for the Wage Statement Class focuses

9      on the "solely based on a salary" language of § 226(a).  Sinohui asserts that even if

10     General Managers are properly classified as exempt, they are entitled to wage statements

11     documenting their total hours worked because they receive bonus compensation in

12     addition to their salaries.  (Mem. at 23.)

13          CEC argues that the Court should deny certification because Sinohui has never

14     pleaded the above claim for wage statement violations.  (Opp. at 25.)  Where the claim or

15     theory underlying a proposed class is absent from the operative complaint, class

16     certification is generally improper.  "Class certification is not a time for asserting new

17     _____

18     controversial," *Dailey v. Sears, Roebuck & Co.*, 214 Cal. App. 4th 974, 998, 998 n.10 (2013)

19     (collecting cases).  As explained above in the Order, Sinohui has failed to demonstrate the
       predominance of common questions of law or fact as to the Misclassification Class.  Sinohui cites

20     no cases where the "mere proposal for statistical sampling" is "an adequate evidentiary substitute
       for . . . manufactur[ing] predominate common issues . . . ."  *See Dailey*, 214 Cal. App. 4th at 998.

21     Moreover, here, as in *Dailey*, "Dr. Drogin's sampling proposal is just that—a generic proposal not
       tied specifically to the facts of this case, or tailored to the evidence presented by the parties."  *Id.*

22     at 99-1000 (citations omitted).  Dr. Drogin's proposal attempts to identify a means of managing

23     the individual questions identified by the Court, but we decline to "certify the [proposed] class
       based on little more than 'abstract statements about what statistical sampling might be able to

24     establish.'"  *Id.* at 1000 (citation omitted).  As the appellate court in *Dailey* held, "[a] trial court

25     does not err in rejecting a proposed statistical sampling procedure when the class action proponent
       fails to 'explain how the procedure will effectively manage the issues in question.'"  *Id.* (quoting

26     *Dunbar*, 141 Cal. App. 4th at 1432).  Thus, to the extent Sinohui supports his motion for class

27     certification with Dr. Drogin's proposal, the Court declines to grant the motion on this basis.

28

1 legal theories that were not pleaded in the complaint." *See Brown v. Am. Airlines, Inc.*,

2 285 F.R.D. 546, 560 (C.D. Cal. 2011). The operative complaint must provide "adequate

3 notice of the claims that underly [sic] the motion to certify [the proposed class]," and the

4 mere "fact that the FAC references particular code sections . . . is not enough to support a

5 motion for class certification." *See York v. Starbucks Corp.*, No. CV 08-07919 GAF

6 PJWX, 2011 WL 8199987, at *10 (C.D. Cal. Nov. 23, 2011). Where proposed classes

7 "seek[] recovery on the basis of a theory not found in the operative complaint," courts

8 generally decline to certify the class. *See id.*; *see also Ortiz v. CVS Caremark Corp.*, No.

9 C-12-05859 EDL, 2013 WL 6236743, at *11 (N.D. Cal. Dec. 2, 2013) (denying class

10 certification because the operative complaint did not set forth the claim underlying the

11 proposed subclass); *Bibo v. Fed. Express, Inc.*, No. C 07-2505 TEH, 2009 WL 1068880, at

12 *7 (N.D. Cal. Apr. 21, 2009) (same); *Munoz v. Giumarra Vineyards Corp.*, No. 1:09-CV-

13 00703-AWI, 2012 WL 2617553, at *17 (E.D. Cal. July 5, 2012) (same), *report and*

14 *recommendation adopted,* No. CIV-F-09-0703 AWI, 2013 WL 2421599 (E.D. Cal. June 3,

15 2013).

16        A thorough review of the FAC indicates that the legal theory underlying this

17 proposed class is not asserted in the operative complaint. Nowhere in the FAC does

18 Sinohui allege that General Managers receive bonus compensation in addition to their

19 salaries, or that this bonus system provides a basis for his wage statement claim. In fact,

20 the allegations pertaining to the wage statement claim explicitly assert that "Defendants

21 improperly and/or illegally classified the Plaintiff and the Class as exempt employees,

22 rather than non-exempt employees, and Defendants failed to comply with California law

23 regarding itemized wage statements." (FAC ¶ 94.) Fairly construed, the FAC alleges that

24 General Managers were entitled to itemized wage statements because they were

25 misclassified as exempt employees, not because they were given bonus compensation.

26 Sinohui argues that the FAC "includes several allegations of this claim," (*see* Reply at 21),

27 but all the paragraphs noted in the Reply merely identify a broad failure by CEC to provide

28

accurate itemized wage statements, (*see* FAC ¶¶ 7(d), 14(d), 42(f), 96).  Where a proposed class "seeks a recovery on the basis of a theory not found in the operative complaint," the mere "fact that the FAC references particular code sections . . . is not enough to support a motion for class certification."  *See York*, 2011 WL 8199987, at *10.  Although Sinohui asserts that his deposition testimony provided notice of this new theory, (Reply at 21), his testimony indicates only that the wage statements failed to state the correct amount of hours worked and that they were inaccurate due to the misclassification of the General Managers, (*see* Sinohui Tr. 403:8-22, 404:13-22, 405:1-6, McLaughlin Decl. Ex. I, Doc. 51-11).  The parties' Joint Rule 26(f) Report similarly fails to mention any claim based upon the payment of bonuses rather than the misclassification of exemption status.  (*See* Rule 26(f) Report, Doc. 21.)  As a result, Sinohui's Motion for Class Certification appears to provide the first articulation of this new legal theory.

Because the proposed class "seeks . . . recovery on the basis of a theory not found in the operative complaint," class certification would be improper.  *See York*, 2011 WL 8199987, at *10.  Accordingly, the Court DENIES certification of the Wage Statement Class on this basis.

### C.   Expense Reimbursement Class

The Court then turns to the Expense Reimbursement Class.  As explained below, the Court finds that Sinohui satisfies the requirements of Rule 23(a) and Rule 23(b)(3) as to both claims underlying this proposed class.  The Court addresses each requirement in turn.

### 1.   Numerosity

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  The Court is persuaded by other district court holdings that "[a]s a general rule, classes of forty or more are considered sufficiently

numerous." *Mazza v. Am. Honda Motor Co.*, 254 F.R.D. 610, 617 (C.D. Cal. 2008).
Although Sinohui fails to identify how many putative class members are included in the
Expense Reimbursement Class, he nevertheless (1) states that CEC employed 126 General
Managers in California during the class period, (*see* Mem. at 15; Trush Decl. ¶ 3), and (2)
provides declarations of at least 49 putative class members who claim they received no
reimbursement for their cell phone and car expenses, (Trush Decl. Exs. 31-78, 80).
Accordingly, the Court finds that the proposed class meets the numerosity requirement.

### 2.    Commonality

Rule 23(a)(2) requires that "there are questions of law or fact common to the class."
Fed. R. Civ. P. 23(a)(2).  "Commonality requires the plaintiff to demonstrate that the class
members 'have suffered the same injury.'"  *Dukes*, 131 S. Ct. at 2551 (quoting *Gen. Tel.
Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)).  The plaintiff must allege that the class'
injuries "depend upon a common contention" that is "capable of classwide resolution."  *Id.*
In other words, the "determination of [the common contention's] truth or falsity will
resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id.*
"What matters to class certification . . . is not the raising of common questions– even in
droves – but, rather the capacity of a classwide proceeding to generate common *answers*
apt to drive the resolution of the litigation."  *Id.* (internal quotation marks and citation
omitted).

Under California law, "[a]n employer shall indemnify his or her employee for all
necessary expenditures or losses incurred by the employee in direct consequence of the
discharge of his or her duties . . . ."  Cal. Lab. Code § 2802(a).  "The purpose of this statute
is to prevent employers from passing their operating expenses on to their employees."
*Cochran v. Schwan's Home Serv., Inc.*, 228 Cal. App. 4th 1137, 1144 (2014) (internal
quotation marks and citation omitted).  For purposes of § 2802, "before an employer's duty
to reimburse is triggered, it must either know or have reason to know that the employee

1    has incurred an expense." *Stuart v. RadioShack Corp.*, 641 F. Supp. 2d 901, 904 (N.D.

2    Cal. 2009). *See also Cochran*, 228 Cal. App. 4th at 1140-41. "Once the employer has

3    such knowledge, then it has the duty to exercise due diligence and take any and all

4    reasonable steps to ensure that the employee is paid for the expense." *Stuart*, 641 F. Supp.

5    2d at 904. Here, Sinohui argues that commonality is met for two underlying claims: (1) a

6    claim for unreimbursed cell phone expenses and (2) a claim for unreimbursed mileage.

7    (*See* Mem. at 16, 24.) The Court addresses each claim in turn.

8

9                              **i.    Cell Phone Expenses**

10            Sinohui sufficiently demonstrates commonality as to his claim for unreimbursed

11   cell phone expenses. "Pulse" is a cell phone application that tracks real time sales and

12   hourly labor in the restaurants. (Brown Tr. 196:18-24, Trush Decl. Ex. 22, Doc. 45-3.) To

13   sufficiently "link" the application to a specific restaurant's information from the "Aloha"

14   system, a General Manager must obtain an access code from CEC's corporate office. (*See*

15   *id.* 197:7-198:5, 334:9-12.) Moreover, General Managers communicate with District

16   Managers through text messages or cell phone calls. (*See id.* 208:5-209:24; Light Tr.

17   121:1-11, Trush Decl. Ex. 28, Doc. 45-5.) Although most General Managers use Pulse

18   and/or communicate with District Managers through their cell phones, (*see id.* 121:1-11,

19   138:25-139:7; Brown Tr. 201:9-14, 208:5-14, 333:10-17; Khan Tr. 300:8-10, Trush Decl.

20   Ex. 26, Doc. 45-5; Charlebois Tr. 82:9-14, 83:12-19, Trush Decl. Ex. 27, Doc. 45-5), CEC

21   does not reimburse them for their cell phone expenses or make an effort to ensure that

22   General Managers submit expense reports for their cell phone bills, (*see* Brown 208:17-

23   209:1, 209:19-24; Khan 330:24-331:2).

24           CEC argues that commonality fails because Sinohui does not present evidence of a

25   common policy requiring General Managers to use their personal cell phones. (Opp. at

26   23.) However, this argument incorrectly frames the issue. The relevant question is not

27   whether CEC explicitly required General Managers to use their personal cell phones

28

through a company-wide policy; it is whether it was necessary under the circumstances for General Managers to use their personal cell phones when discharging their duties.  *See Grissom v. Vons Cos.*, 1 Cal. App. 4th 52, 58 (1991).  CEC correctly notes that "the mere fact that employees use personal cell phones for work-related calls or texts is not enough to establish mandatory use requiring reimbursement," (Opp. at 23), but the record demonstrates that CEC expects its General Managers to (1) track the real time sales and labor hours of their restaurants and (2) directly communicate with the District Managers supervising them.  Thus, whether it is "necessary" for General Managers to use their personal cell phones when discharging the above duties is a common contention that is very "capable of classwide resolution." *Dukes*, 131 S. Ct. at 2551.  Moreover, whether CEC knows or should know that General Managers have incurred cell phone expenses when (1) General Managers request a "Pulse" access code from the corporate office and (2) District Managers contact General Managers on their personal cell phones is another common contention that will "resolve an issue . . . central to the validity of each one of the claims in one stroke." *Id.*

Accordingly, the Court finds that the proposed class meets the commonality requirement as to cell phone expenses.

### ii.    Mileage

Sinohui also satisfies the commonality requirement as to his claim for unreimbursed mileage.  Sinohui asserts that General Managers must use their cars to discharge a variety of work duties, including going to the bank, attending fundraisers and meetings, and picking up supplies.  (*See* Mem. at 13; Reply at 24-25.)  Sinohui argues that this uniform expectation satisfies the commonality requirement.   (Mem. at 16.)  In its opposition, CEC notes that it has policies allowing the reimbursement of reasonable business expenses, including mileage.  (Opp. at 24.)  CEC therefore argues that commonality fails because "there is no common policy of *denying* mileage reimbursement."  (*Id.* (emphasis added).)

To satisfy the commonality requirement, Sinohui is not required to point to a common policy denying mileage reimbursement; he need only identify a common question "central to the validity" of his claim that is "capable of classwide resolution." *See Dukes*, 131 S. Ct. at 2551.  Notably, CEC does not contest that the above duties identified by Sinohui are work duties generally required of General Managers.  As with the cell phone expenses, whether it is "necessary" for General Managers to use their cars when discharging these duties is a common contention that is very "capable of classwide resolution." *Id*.  The resolution of this common question will resolve, "in one stroke," an issue "central to the validity" of the mileage reimbursement claim. *Id*.  As a result, Sinohui meets the commonality requirement of Rule 23(a).

### 3.   Typicality

Rule 23(a)(3) requires "the claims or defenses of the representative parties [to be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).  "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably coextensive with those of absent class members; they need not be substantially identical." *Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571, 613 (9th Cir. 2010) (en banc) (quoting *Hanlon*, 150 F.3d at 1020), *rev'd on other grounds*, 131 S. Ct. 2541 (2011).  As to the representative, "[t]ypicality requires that the named plaintiffs be members of the class they represent." *Id.* (citing *Falcon*, 457 U.S. at 156).  The commonality, typicality, adequacy-of-representation requirements "tend to merge" with each other. *Dukes*, 131 S. Ct. at 2551 n.5 (citing *Falcon*, 457 U.S. at 157-58 n.13).

The Court finds that Sinohui satisfies the typicality requirement.  Sinohui sufficiently establishes he is a member of the Expense Reimbursement Class he seeks to represent.  (Sinohui Decl. ¶¶ 2-3, Trush Decl. Ex. 80, Doc. 45-10.)  Moreover, his claims and those of the putative class rely on similar courses of conduct, namely the use of a personal cell phone and vehicle when discharging the duties of a General Manager and

CEC's failure to reimburse these expenses.  Accordingly, the Court finds that typicality is satisfied.[5]  *See Baghdasarian v. Amazon.com, Inc.*, 258 F.R.D. 383, (C.D. Cal. 2009) (finding the typicality requirement satisfied because "the named Plaintiff and the members of the proposed class 'all have claims arising from the [same] . . . scheme.'" (alteration in original) (quoting *Krell v. Prudential Ins. Co. of Am*. (*In re Prudential Ins. Co. Am. Sales Practic Litig. Agent Actions*), 148 F.3d 283, 311 (3d Cir. 1998)).

### 4.  **Adequacy**

Rule 23(a)(4) permits certification of a class action only if "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  "This factor requires: (1) that the proposed representative Plaintiffs do not have conflicts of interest with the proposed class, and (2) that Plaintiffs are represented by qualified and competent counsel."  *Dukes*, 603 F.3d at 614 *rev'd on other grounds*, 131 S. Ct. 2541.

The Court first considers whether Sinohui has any conflicts with the proposed class. Sinohui argues he has no conflict of interest with the proposed class.  (Mem. at 17.)  Given that Sinohui seeks the same legal remedies as the putative class arising from a similar course of conduct and CEC does not identify any adequacy concerns as to this putative class, the Court finds no reason to challenge Sinohui's adequacy to protect the interests of this class.

Second, as to the adequacy of Plaintiff's counsel, the Court must consider "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the

---

[5] CEC argues that Sinohui fails to satisfy the typicality requirement of Rule 23(a), (*see* Opp. at 7 n.4), but these arguments are limited to the individualized nature of Sinohui's misclassification claims, (*id*. at 6-7).  Accordingly, the Court does not address this argument here in the context of the Expense Reimbursement Class.

resources that counsel will commit to representing the class."  Fed. R. Civ. P. 23(g)(1)(A).

Here, James M. Trush of the law firm Trush Law Office, APC, Todd H. Harrison of the

law firm Perona Langer Beck Serbin Mendoza Harrison, APC, and Brennan S. Kahn of the

law firm Perona Langer Beck Serbin Mendoza Harrison, APC set forth, by declaration, the

experience they have in litigating wage and hour class action lawsuits in state and federal

courts.  (Trush Decl. as to experience ¶¶ 2-4, Trush Decl. Ex. 81, Doc. 45-10; Harrison

Decl. ¶¶ 3-12, Trush Decl. Ex. 82, Doc. 45-10; Kahn Decl. ¶¶ 3-10, Trush Decl. Ex. 83,

Doc. 45-10.)  In light of the information provided in the declarations of Plaintiff's Counsel,

the Court concludes that Plaintiff's Counsel are sufficiently qualified and competent to

satisfy Rule 23.[6]

Accordingly, the Court appoints Richard Sinohui as the Class Representative and

James M. Trush, Todd H. Harrison, and Brennan S. Kahn as Class Counsel of the Expense

Reimbursement Class.

### 5.    Predominance

As noted above, the Supreme Court has explained that the predominance

requirement "tests whether proposed classes are sufficiently cohesive to warrant

adjudication by representation."  *Amchem Prods.*, 521 U.S. at 623.  "Implicit in the

satisfaction of the predominance test is the notion that the adjudication of common issues

will help achieve judicial economy."  *Valentino*, 97 F.3d at 1234.  "When common

questions present a significant aspect of the case and they can be resolved for all members

of the class in a single adjudication, there is clear justification for handling the dispute on a

---

[6] CEC notes in its Opposition that it believes Plaintiff's Counsel violated the protective order
in this case and made false or misleading statements when communicating with putative class
members.  (Opp. at 5 n.2.)  CEC states that this alleged conduct could impact certification, but it
explains it is currently conducting discovery on this issue and expects to raise it with the Court in
a motion to disqualify.  (*Id.*)  The Court will not address these allegations unless and until CEC
properly raises this issue in a noticed motion.

1  representative rather than on an individual basis." *Hanlon*, 150 F.3d at 1022 (quoting 7A

2  Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure §

3  1778 (2d ed.1986)).

4

5                              **i.      Cell Phone Expenses**

6          The Court finds that individualized issues will not predominate as to the cell phone

7  expenses claim.  As explained above, multiple common questions exist when resolving this

8  claim.  Whether it is "necessary" for General Managers to use their personal cell phones

9  when tracking the real time sales and labor hours of their restaurants or communicating

10 with their supervisors is a common contention capable of classwide resolution, as is

11 whether CEC knows or should know that General Managers have incurred cell phone

12 expenses when the latter request a "Pulse" access code from the corporate office or

13 communicate with District Managers through their cell phones.  CEC argues that

14 determining whether personal cell phone use was required would be highly individualized

15 because, "[f]or example, the [C]ourt would need to look at which GMs used cell phones,

16 the purpose of the calls or texts for which they were used, why they used their cell phone

17 instead of another phone (e.g. restaurant phone, home land line), and what statements their

18 supervisors or other superiors made to them to make them believe it was required."  (Opp.

19 at 23.)  The Court is not persuaded by these arguments.  Whether it was necessary for

20 General Managers to use their cell phones when discharging their duties does not depend

21 on the specific statements made by their individual superiors.  That General Managers

22 have communication alternatives, such as their restaurant phone or home land lines, is a

23 consideration that may be applied on a class wide basis to determine the necessity of cell

24 phone use.  Finally, considering which General Managers used cell phones and the purpose

25 for their calls or texts is a question of damages rather than liability.  Whether certain

26 putative class members are ultimately entitled to damages is a separate question from

27 whether CEC had a duty to reimburse General Managers' cell phone expenses.  To the

28

extent individualized questions arise when calculating damages, the Ninth Circuit has held that "[i]n this circuit, . . . damage calculations alone cannot defeat certification." *Yokoyama v. Midland Nat'l Life Ins. Co*., 594 F.3d 1087, 1094 (9th Cir. 2010).

CEC also argues that predominance is not met because some General Managers have not downloaded the "Pulse" app or have only used it a few times. (Opp. at 23.) Such arguments also speak to the potentially individualized nature of determining damages, not liability. Although "damages determinations are individual in nearly all wage-and-hour class actions," this "does not defeat class action treatment." *Leyva v. Medline Indus. Inc*., 716 F.3d 510, 513-14 (9th Cir. 2013) (internal quotation marks and citations omitted). *See also Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir. 1975) ("The amount of damages is invariably an individual question and does not defeat class action treatment."). Thus, at this stage, the Court finds that individualized issues will not predominate with respect to determining liability for this claim. Accordingly, Sinohui has satisfied the predominance requirement of Rule 23(b)(3) as to his claim for unreimbursed cell phone expenses.

### ii.    Mileage

The Court also finds that individualized issues will not predominate as to the mileage claim. As explained above, whether it is "necessary" for General Managers to use their cars when discharging their duties is a common question that is very capable of "classwide resolution." *Dukes*, 131 S. Ct. at 2551. CEC argues that determining whether someone was denied reimbursement would overwhelm common questions because, for example, "not every GM uses his or her car for the same things." (Opp. at 24.) CEC also argues that whether an employer "know[s] or ha[s] reason to know that [an] employee has incurred [a covered] expense" will remain an individualized inquiry. (*Id*. (quoting *Stuart*, 641 F. Supp. 2d at 903-04.) To support this argument, CEC notes that certain General Managers admit they did not notify anyone when they used their cars in the discharge of their duties. (*Id*.) Finally, CEC identifies certain policies specifying that CEC will

reimburse mileage and "business use[s] of personal automobiles."  (Sinohui Tr. 397:18-398:13, Ex. 9 at 245, McLaughlin Decl. Ex. I, Doc. 51-11; Brown Decl. ¶ 7, Ex. A at 307-08; Doc. 51-15).  CEC asserts that individualized questions will predominate when determining whether General Managers were aware they could be reimbursed or whether they were in fact reimbursed for mileage.  (Opp. at 24.)

The Court is not persuaded by CEC's arguments.  As noted above, Sinohui points to common policies and practices that require General Managers to use their cars for work purposes.  (*See* Mem. at 13; Reply at 24-25.)  Whether this uniform expectation creates a "reason to know that the employee has incurred an expense" that then triggers CEC's duty to reimburse is a common question capable of classwide resolution.  Further, whether CEC's reimbursement policies satisfy its duty to exercise due diligence is a common question capable of classwide resolution.  Finally, whether General Managers (a) have been reimbursed for mileage or (b) use their cars differently when discharging their duties are questions of damages, not liability.  As with the cell phone expenses claim, whether certain putative class members are ultimately entitled to damages is a separate question from whether CEC had a duty to reimburse General Managers' mileage.  "In this circuit, . . . damage calculations alone cannot defeat certification."  *Yokoyama*, 594 F.3d at 1094. *See also Blackie*, 524 F.2d at 905 ("The amount of damages is invariably an individual question and does not defeat class action treatment.").

Accordingly, Sinohui has satisfied the predominance requirement of Rule 23(b)(3) as to his claim for unreimbursed mileage.

### 6.  <u>Superiority</u>

As to the Expense Reimbursement Class, the Court finds that a class action would be a superior method of adjudicating Plaintiff's claims.  "The superiority inquiry under Rule 23(b)(3) requires determination of whether the objectives of the particular class action procedure will be achieved in the particular case."  *Hanlon*, 150 F.3d at 1023.  "This

1    determination necessarily involves a comparative evaluation of alternative mechanisms of

2    dispute resolution." *Id.*  Here, each member of the class pursuing a claim individually

3    would burden the judiciary and run afoul of Rule 23's focus on efficiency and judicial

4    economy.  *See Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 946 (9th Cir. 2009)

5    ("The overarching focus remains whether trial by class representation would further the

6    goals of efficiency and judicial economy.").  Further, litigation costs would likely "dwarf

7    potential recovery" if each class member litigated individually.  *Hanlon*, 150 F.3d at 1023.

8    "[W]here the damages each plaintiff suffered are not that great, this factor weighs in favor

9    of certifying a class action."  *Zinser v. Accufix Research Inst. Inc.*, 253 F.3d 1180, 1199 n.2

10   (9th Cir. 2001) (quoting *Haley v. Medtronic, Inc.*, 169 F.R.D. 643, 652 (C.D. Cal. 1996)).

11           Considering the non-exclusive factors under Rule 23(b)(3)(A)-(D), the Court finds

12   that class members' potential interests in individually controlling the prosecution of

13   separate actions and the potential difficulties in managing the class action do not outweigh

14   the desirability of concentrating this matter in one litigation.  *See* Fed. R. Civ. P.

15   23(b)(3)(A), (C), (D).  The Court is not aware of any litigation concerning the controversy

16   already commenced by or against members of the class.  *See* Fed. R. Civ. P. 23(b)(3)(B).

17   Thus, the Court finds the Expense Reimbursement Class may be certified under Rules

18   23(a) and 23(b)(3).

19

20           **D.      Unfair Business Practices Class**

21           The proposed Unfair Business Practices Class, as defined, is entirely derivative of

22   the Wage Statement Class and the Expense Reimbursement Class.  (*See* Mem. at 3.)  In the

23   FAC, Sinohui asserts a § 17200 claim for unfair business practices that is derivative of his

24   wage statement and expense reimbursement claims.  (FAC ¶¶ 149-51.)  As explained more

25   fully above, the Court certifies the Expense Reimbursement Class.  Thus, the Court need

26   not independently analyze either the derivative § 17200 claim or the derivative Unfair

27   Business Practices Class for the purposes of class certification.  *See Alonzo v. Maximus,*

28

*Inc.*, 275 F.R.D. 513, 518 n.5, 527 (C.D. Cal. 2011).  The Court therefore certifies the Unfair Business Practices Class to the extent it pertains only to the Expense Reimbursement Class.  Accordingly, the Court adjusts the class definition to the following: all persons employed by CEC in California as an exempt General Manager from October 10, 2010 through the date of Judgment, and who are members of the Expense Reimbursement Class.

## IV.   **<u>CONCLUSION</u>**

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART Sinohui's Motion for Class Certification.

1) The following classes are certified under Rules 23(a) and 23(b)(3):

    a.  The Expense Reimbursement Class: all persons employed by CEC in California as an exempt General Manager from October 10, 2010 through the date of Judgment, who were not reimbursed for cell phone expenses and/or mileage.

    b.  The Unfair Business Practices Class: all persons employed by CEC in California as an exempt General Manager from October 10, 2010 through the date of Judgment, and who are members of the Expense Reimbursement Class.

2) Plaintiff Richard Sinohui is appointed as the class representative.

3) James M. Trush, Todd H. Harrison, and Brennan S. Kahn are appointed as class counsel.

4) The Court directs the parties to meet and confer and to submit an agreed-upon form of class notice that will advise class members of, among other things, the damages sought and their rights to intervene, opt out, submit comments, and contact class counsel.  The parties shall also jointly submit a plan for the dissemination of the proposed notice.  The parties must work together to

generate a class list to be used in disseminating class notice, and they must work together to create a notice that satisfies Rule 23.  The proposed notice and plan of dissemination, as well as a proposed order granting approval, shall be filed with the Court on or before **April 15, 2016**.

DATED: March 16, 2016

_____

JOSEPHINE L. STATON
UNITED STATES DISTRICT JUDGE